New-York General Term, July, 1848.    *Strong, McCoun, and Edwards,* Justices.

Taylor and wife *vs.* Fleet

Fleet *vs.* Taylor and others.

Parol evidence adduced to rescind a sale of real estate, on the ground of fraud or mistake, where the sale has been consummated by a conveyance, ought not to ¬prevail unless it amounts to strong and conclusive proof. *Per* Strong, P. J.

Fraud, in such a case, must be clearly proved. It is not to be inferred, from slight presumptions. *Per* Strong, P. J. and Edwards, J.

The power of rescinding a sale of real estate is one of the highest attributes of a court of equity. The public good requires that it should be exercised with great caution, and only in cases of extraordinary hardship. The instances in which the power has been exerted, in this country and in England, are generally cases where it is necessary to prevent great and almost irretrievable mischief. *Per* Strong, P. J.

Ordinary mistakes on the part of the purchaser, relative to the qualities of the property, caused by the communications of the seller, do not call for the interposition of a court of equity. *Per* Strong, P. J.

Common prudence requires that a purchaser of land should guard against the propensity of the vendor to commend the good qualities of his property, by personal

Taylor *v.* Fleet.

examination and inquiry when that is practicable. But he is excusable for not making such examination and inquiry when it would be difficult, or is prevented by the artifice of the vendor. *Per* STRONG, P. J.

It would be impolitic, and often unjust, to set aside a sale of real estate because the seller had warmly commended the qualities of the property, and the buyer had been consequently disappointed. The rule in such cases is " *simplex commendatio non obligat.*" *Per* STRONG, P. J.

These considerations, however, apply only to cases free from fraud. Where that exists the perpetrator should bear all the consequent losses. *Per* STRONG, P. J.

Neither should a sale be vacated by reason of a mistake caused by the representations of the seller, unless the difference between the recommended and actual value of the property is very considerable. A mere disappointment, on the part of the buyer, in some unimportant particular—although he may have made it the principal inducement for his purchase—is not enough. *Per* STRONG, P. J.

To entitle a party to relief in a court of equity on the ground of mistake, in a case free from fraud, the mistake must be, as to a material fact constituting the very essence and condition of the contract, and the mistake must be as to a fact of such a nature that the party could not, by reasonable diligence, get knowledge of it when put upon inquiry. *Per* EDWARDS, J.

If the fact in reference to which the party alleges he was mistaken, is one of which he might have obtained knowledge, by reasonable diligence, a court of equity will suppose that he must have had knowledge. In other words, knowledge will be imputed to him *qui eam rem diligenter inquirendo notam habere possit. Per* EDWARDS, J.

IN EQUITY. This was a rehearing of cases upon bill and cross-bill, originally heard before Justice HARRIS, at the special term in New-York, in December, 1847. The decision made at the special term is reported in 1 *Barb. Sup. Court Rep.* 471.

*J. A. Lott & C. O'Conor,* for the defendant in the first suit and plaintiff in the second.

*W. C. Noyes,* for the plaintiffs in the first and the defendants in the second suit.

STRONG, P. J. Parol evidence adduced to rescind a sale of real estate, on the ground of fraud or mistake, where the sale has been consummated by a conveyance, ought not to prevail unless it amounts to strong and conclusive proof. Our laws very properly require that every contract for the sale of any lands, or of any interest in lands, shall be in writing, and that, except

Taylor *v.* Fleet.

when an estate or interest in lands passes by operation of law, no such estate or interest, other than leases for a term not exceeding one year, shall be created, granted, assigned, surrendered or declared, except by a deed or conveyance in writing. It is also well settled that all verbal propositions made during a negotiation which ends in a written contract are merged in the writing. That in general excludes all other evidence. The admission of oral evidence to prove fraud, or a mistake, in a written contract, is based on the ground that either may, if sufficiently extensive, avoid the contract altogether. Still the admission of oral evidence, depending as it does upon the recollection of witnesses, and sometimes colored by their partialities, seems to be a departure from the safe principle to which I have alluded, and can be justified only from necessity. The danger of admitting such evidence, and the little reliance which can be placed upon it, are illustrated by the case now under consideration. The principal ground on which the purchaser relies to set aside the sale, is that the vendor untruly and fraudulently represented during their negotiations, that the land in question " was full as early, if not earlier, than any other land on the west end of Long Island, and was as well adapted to the raising of all sorts of early vegetables, fruits and market produce, as any other land on that end of the island." The purchaser introduced two witnesses to prove this alleged misrepresentation. The first, (Henry A. Ovington, who is his brother-in-law,) testified that Fleet the vendor "represented the land as being the best adapted for the purpose we wanted it for, raising early vegetables for the New-York market," and also said "there was no earlier land any where about." This witness was then in negotiation with Fleet for the purchase of another tract of land in the same neighborhood, and he told Fleet in the presence of Healy, a broker, who had something to do with the matter, that his object was to get the *earliest land that could be had,* and Healy said it was just the land the witness ought to have. The other witness, (William H. Ovington, who was the son of the first,) testified that he was a clerk in the office where the negotiations between his father and

uncle and Fleet were conducted, and was generally present at their conversations ; that it was stated that Mr. Taylor's object was to procure *the earliest land that could be obtained* for the purpose of market gardening, and that he heard Fleet say that this *land is as early as any that could be obtained.* This witness, on his cross-examination, says " I think Mr. Fleet's words were, it is the earliest land that can be obtained." The learned justice who heard and decided these cases at the special term, seems to think that the representations mentioned by these witnesses are substantially the same, and that they prove the charge contained in the bill. In this I differ from him. There may have been a great difference between the earliest of all the lands on the west end of Long Island, and of those which were for sale. Indeed there is strong reason to suppose that such was the fact. There is no evidence that any of the shore lands which were proved to have been earlier than the land in question were for sale, although some of the witnesses were questioned on the subject. Henry A. Ovington said he found no such land for sale. If the representation made by Fleet was that his was the earliest land which could be obtained, and there was none *earlier* for *sale*, it would have been literally true, and as that land is described by two of the witnesses as early, the representation would form no legitimate subject of complaint. Taylor may have misunderstood it, but that would have been his misfortune. As he could have no remedy for any mistake of his own, not caused by any misrepresentations of, or concealment by, Fleet, the testimony of William H. Ovington, if it is to be believed, would be fatal to the application to rescind the sale. One remark made by Henry A. Ovington would seem to confirm the testimony of his son. He says that his object.was the same as Mr. Taylor's, and that was to procure the earliest land that could be had. If these two witnesses differed, as they evidently did, one proving a representation favorable, and the other unfavorable, to Mr. Taylor, as they were both introduced by him, and from all that appears were equally intelligent, and had the same opportunities for hearing, it would seem to be no more than right to

consider the testimony as balanced, and then the charge in the bill would fall, from a want of proof.

The other charges in the bill are destitute of proof, and no reliance was placed upon them, either by the learned judge at the special term, or the counsel who argued the case in behalf of Mr. Taylor here. If, however, the testimony of Henry A. Ovington is taken in preference to that of his son, there is nothing to establish the charge of fraud against Fleet. He had not resided on the land, but had managed it principally by a farmer who had worked it upon shares. His own place of residence was at Brooklyn, which was some four or five miles distant. True he had owned it several years, and had shared in the rents and profits, and if the difference between the early productiveness of that land, and the lands generally on that end of the island, had been such as essentially to diminish the prof- its, it would probably have been known to him. If, however, a few only of the farms in that neighborhood had been so early as to form exceptions in that particular to the land on that end of the island, he might have been ignorant of the fact. The proof is, that although the land in that vicinity extending from the shore to some quarter of a mile in the interior was from a week to ten days earlier, yet that the land in question was early compared with the lands generally on that part of the island. George Pool, who had worked the place from 1837 to 1842, and John Pool, who was head workman for Mr. Taylor from March until August, both give it that character, and there is no witness who differs from them. Taylor, too, was to take immediate possession of the dwelling house, (in August,) agreeably to the contract, and could have easily ascertained the falsity of any deceptive recommendation before the deed was to be given, which was on the first day of the following March. From all this it may be naturally inferred that Fleet did not make the representations attributed to him, whatever they may have been, in bad faith. Fraud should be clearly proved, not inferred from slight presumptions.

There can be no doubt that Taylor was disappointed when he found that there was other land which produced earlier

Taylor. *v.* Fleet.

crops than his. But the facts do not show that his disappointment for that cause was very great, or that it gave him any very serious cause for complaint against Fleet. He agreed to purchase the place on the 15th of August, 1841. He visited it occasionally between that time and the following March, and found upon it an experienced farmer who had cultivated it six years. If his principal object had been to obtain a place capable of raising the earliest vegetables, he would naturally have made some inquiries of this man, and ascertained its true character in that particular. He took a deed on the 1st of March, 1842, and then went into possession. He made a valuable addition to the dwelling house, cultivated the farm by an experienced superintendent, was frequently there, saw the growth of the various crops, and received the avails. The early fruits and crops, about which he expressed so much anxiety, were strawberries, raspberries, cucumbers, potatoes, corn and melons. The usual times when these are fit for market are, for strawberries, in May, raspberries, cucumbers and potatoes in June, and corn and melons in July. He must have known by the latter part of July whether the land was forward or backward in the production of these early crops. Strawberries and raspberries seem to have been of the most importance; and he doubtless ascertained the capacity of the land to produce these fruits early or late by the middle of June. Now if he had been misled in reference to this matter by the representations of Fleet, and the consequent injury had been to the extent of which he now complains, it is most singular that he (being, as he is, well versed in the law,) should not have made immediate complaint, and called for prompt redress. On the contrary, he waited until the 31st of October, when he executed a reconveyance, and eventually tendered it to Fleet on the 6th of December. The inference would seem to be that he was not influenced on the 31st of October solely by what had come to his knowledge previous to the middle of the antecedent July, but partly at least by what he had ascertained afterwards—and such, no doubt, was the fact. Mr. Taylor probably (as is generally the case with lawyers who turn agriculturists,) expected that his theo-

retical knowledge would enable him to pursue his new occupation much more profitably than those who had followed it all their lives. He had doubtless read many of the publications on the subject, with which farmers have been favored, sometimes by those who are very learned theoretically, and sometimes by those who know nothing about the matter either theoretically or practically. Probably, like his brother-in-law, Mr. Ovington, he had been "studying agricultural works for *six months* previously to ascertain the best mode of getting things early, such as selecting the eyes from the points of potatoes." He endeavored to carry his book learning into practice. His farmer, Mr. Poole, was asked whether Taylor interfered with him in the direction of the farm; his answer was "yes sir, with his books." This witness was asked on his cross-examination whether Taylor interfered or prevented his general management of the farm; his answer was, "by his fetching his books forth to say that his books did not say so when I proposed any thing." And when asked if he considered that the management on the farm was as proper as if he had had the control himself, he answered "no sir." When those facts are taken into consideration, in connexion with the statement of two of the witnesses that the season was unpropitious for farmers, and that the farming operations were retarded by building an addition to the house, it is not at all strange that the project was unsuccessful; and it is very natural that Mr. Taylor should come to the conclusion that he had better adhere to the law, where he had obtained reputation and profit, than resort to farming where he could probably acquire but little of either. In such cases men are much more apt to attribute the failure to some fault of another than to their own want of judgment, and it is by no means improbable that Taylor then gave additional character to the representations of Fleet, and their consequences.

The power of rescinding a sale of real estate is one of the highest attributes of a court of equity. The public good requires that it should be exercised with great caution, and only in cases of extraordinary hardship. The reasons are too obvi-

Taylor v. Fleet.

ous to require repetition here. The instances in which the power has been exerted in this and the mother country are generally cases where it is necessary to prevent great and almost irretrievable mischief. If there are any exceptions, I am not inclined to follow them. Ordinary mistakes of the purchaser, relative to the qualities of the property, caused by the commendations of the seller—and that which I am considering is but little more—by no means call for the interposition of a court of equity. Such commendations are so common and natural that they are generally expected, and duly estimated. The proprietor forms an exaggerated opinion of his land, and particularly of its comparative good qualities. He may therefore sincerely and honestly praise them. Common prudence requires that a purchaser should guard against this propensity, by personal examination and inquiry. He is excusable for not doing so when such examination or inquiry would be difficult, or when they are prevented by the artifice of the seller. In this case personal inspection would have been easy. The farm was not more than five miles distant, and easy of access. Probably Taylor could not have ascertained by mere inspection the capacity of the land to produce early crops, but he could by inquiry have readily obtained all requisite knowledge on that subject. A man then occupied the place who had worked it upon shares for several years: he was of course well acquainted with the qualities of the land, and particularly its capacity for the production of crops early or late, and there is no reason to suppose that he would not have readily communicated his knowledge in those particulars to Taylor. If Taylor had not visited the land before making his purchase, he would have been guilty of negligence; and so he was if he visited it and made no inquiry in reference to a matter which he alleges was of great consequence to him. It does not appear that he was induced to abstain from a personal examination of the land, or making further inquiry, by any efforts of Fleet designed for such purpose. Nor is it apparent, or inferable from the circumstances, that Fleet had any expectation or wish that Taylor would refrain from exercising the ordinary caution of a buyer.

On the contrary, Fleet knew that the examination and inquiry could be made with the greatest facility; and he must have been aware that they would have resulted in the detection of any gross error in his description of the qualities or capacity of the land. If in all this Taylor has been careless or imprudent, he cannot reasonably expect this court to interpose in his behalf. "*Vigilantibus non dormientibus jura subveniunt.*"

It would be impolitic, and often unjust, to set aside a sale merely because the seller had warmly commended the qualities of the property, and the buyer had been consequently disappointed. The rule in such cases is "*simplex commendatio non obligat.*" Purchasers are often, perhaps generally, disappointed in reference to some supposed quality of what they obtain. To allow them to escape from their bargains for such causes would generate great carelessness on their part, and would constitute a fruitful source of litigation. It would create an uncertainty in our sales which, particularly as to those which relate to real estate, would be most mischievous. These considerations should of course apply only to cases free from fraud. Where that exists, the perpetrator should bear all the consequent losses, and the courts should not hesitate to encounter any labor which may be requisite to detect and punish it.

Neither should a sale be vacated by reason of a mistake caused by the representations of the seller, unless the difference between the recommended and actual value of the property should be very considerable. A mere disappointment of the buyer in some unimportant particular, although he may have made it the principal inducement for his purchase, is not enough. That may sometimes happen without any farther injury, and he may yet have the worth of his money. The law does not protect the fanciful, but only the substantial, interests of suitors. The real injury in the case under consideration does not seem to have been very great. The land, it is true, does not produce as early crops as the other shore lands in the same vicinity. The difference in value between the two, for gardening purposes, is variously estimated by the witnesses; some of them say that it is about half, while the others think

Taylor v. Fleet.

that it is about fifty dollars the acre. It no where appears, however, that Fleet would have sold the land for the price which he obtained, if with its superior advantages of location, it had possessed equal capacity for raising early products. He sold it for its own qualities, not for those of other lands. Taylor, however, expected to obtain as early land as any in that vicinity, and was so far disappointed. But that could not have been his only object. He wished to obtain an agreeable and healthful place of residence for himself and his family. That he has procured, although probably he does not value it so highly now as he did at the time of his purchase, as, owing to the fortunate restoration of his health, he has returned to New-York. Neither could he have reasonably supposed that all the land could be used for the sole purpose of raising early vegetables and fruit. Even on the shore farm adjoining, according to the testimony of the owner, (Mr. Prince,) but half of the land is adapted for that use. No doubt Taylor intended to devote a considerable portion of his farm to other usual purposes, such as grazing for his horses and cows, and raising hay for his stock, and grain and other provisions for his family. The witnesses describe this land as being well adapted for ordinary farming purposes. There was no disappointment in that respect. Besides, lands in this vicinity are frequently, perhaps generally, purchased on speculation, to be sold as building lots. Lawyers in particular are much more in the habit of speculating in lands than of laboring on them. The price given for this land was considerably more than any land was worth for gardening purposes. It exceeded 250 dollars the acre, although Mr. Prince thinks that the value of the best land for gardening purposes does not exceed 150 dollars the acre. It would seem that lands in this neighborhood generally sell for much more than they are worth for raising early products, and are more valuable for other objects. Mr. Prince, at a time when the price of land was low, gave 8000 dollars for 36 acres, the buildings being valued at 400 dollars. True, his was a shore farm, but he says that Taylor's farm would produce as high an annual rent as his. Ovington gave 6000 dollars for 25 acres ad-

Taylor *v.* Fleet.

joining Taylor's, and possessing about the same advantages. Speculation seems to prevail to a considerable extent in this part of the country.  Mr. Prince obtained 1000 dollars for two acres, and asks at the rate of 400 dollars for an acre of his land situate on a line with Taylor's farm.  On a careful examination of all the testimony, it appears to me that, although Mr. Taylor may have been disappointed in the particular of raising early crops, he did not give much, if any, more than the market value of the land.  It is rather a confirmation of this conclusion that Fleet, who is described as a good judge of the value of lands, gave the same price for it some six years before—at least such was Fleet's assertion to Taylor—and it was not contradicted, as it might easily have been, and would have been, had it been untrue.

The circumstances of this transaction are far from bringing it within the mischiefs proved in the principal cases where sales have been rescinded, by reason of mutual mistakes, by courts of equity.  In *Bingham* v. *Bingham*, (1 *Ves. sen.* 127,) the vendee acquired nothing by his deed, he having by mistake purchased his own land.  In *Stapleton* v. *Scott*, (13 *Ves.* 425,) the vendors, who acted as executors, had no power to sell.  In *Hitchcock* v. *Giddings*, (4 *Price* 135,) the vendor engaged to sell land in which he had no interest whatever.  In *Champlin* v. *Laytin*, ( 1 *Edw. Ch. R.* 471 ; 6 *Paige*, 189,) the two lots which were conveyed by the deed had been previously dedicated as streets, and the owner was entitled to, and was eventually awarded, only a nominal sum for damages.  In *Fulton's Executors* v. *Rosevelt*, (5 *John. Ch. Rep.* 174 ; *and* 2 *Cowen's R.* 129,) the purchase was of a coal mine which, as it turned out, was under the bed of a navigable river, and could not be worked.  In *Stewart* v. *Andrews*, which came before us last January, the deed was for a narrow strip of land in Buffalo, extending from the canal to the lake.  It was described in the deed as being bounded on the south by a street 66 feet wide. The land had been purchased for building lots, and was worthless for any other purpose.  It was discovered after the sale that the street from the canal to the lake, instead of being 66

VOL. IV.                    14

feet, was but 11 feet wide. The land, for that cause, was not worth a tenth part of the purchase money. We therefore affirmed so much of the vice chancellor's decree as annulled the sale.

There is no comparison between these cases and that now before us. Nor do we see any thing in the evidence which calls upon us to rescind the sale in question.

The decree made at the special term must be reversed with costs. The bill filed by Mr. and Mrs Taylor must be dismissed also with costs. In the other suit a decree may be entered directing a reference to ascertain the amount due, and providing that upon the coming in and confirmation of the report the mortgaged premises shall be sold, to satisfy the amount reported to be due, with the interest and costs.

EDWARDS, J. The justice by whom this cause was decided at the special term, held that the complainant was entitled to relief, on the ground of mistake. The bill, however, seeks relief upon the additional ground of fraud. And the case was pressed upon the argument, and must now be decided, upon both the grounds taken in the bill.

The first question to be considered is, whether the sale was made upon false and fraudulent representations.

There was no dispute upon the argument, as to the law upon this subject, and the question is entirely one of fact. The fraudulent representation alleged in the bill is, that the land was as early if not earlier, than any land on that part of Long Island. The proof of the alleged fraudulent representation, rests upon the testimony of Henry A. Ovington, the brother-in-law, and William H. Ovington, the nephew of the complainant, each of whom professes to testify to the same conversation.

The last named witness says that the defendant represented that the land in question was as early as any that could be obtained. The other witness says that the defendant stated that there was no earlier land any where about. A question was raised upon the argument, as to what was the meaning of the representation testified to by William H. Ovington. On the

Taylor *v.* Fleet.

one side it was contended that it meant no more than that the land was as early as any that there was for sale, and that there was no proof that there was any earlier land for sale. On the other hand it was contended that the expression meant that the land was as early as any on that part of the island. It is not necessary, with the view that I have taken of this question, to decide which is the proper meaning to be given to this representation. To say the least of it, the meaning is ambiguous. There is some, though less ambiguity as to the meaning of the representation testified to by Henry A. Ovington. It will be remarked that while these witnesses both testify to the same conversation, they not only differ from each other, but each differs from the allegations contained in the bill of complaint.

Now, adopting the elevated rule of morality which is laid down in the case of *Doggett* v. *Emmons,* (2 *Story,* 473,) and which was relied upon by the justice who decided this case at the special term, and assuming it to be, as it undoubtedly is, a clear principle of equity that there should be "the most scrupulous good faith and exalted honesty in every representation made by a vendor as an inducement to the sale;" still there is another principle of law, equally well settled, that when fraud is charged, it must be clearly and fully substantiated by proof. *Dolum non nisi perspicius indiciis probari convenit.* (1 *Poth. on Oblig. by Evans, p.* 19, *n.* 30. 1 *Story Eq. Juris.* § 194.)

Where there is ambiguity in the meaning of the expression used, how can it be said with certainty that the representation is either false or fraudulent? And *a fortiori,* how can fraud be imputed when there is discrepancy and uncertainty in the proof itself? But irrespective of this, and even if it should be admitted that the representation alleged in the bill has been substantially proved, still it seems to me that the testimony does not establish a case of bad faith on the part of the defendant.

The next ground on which the complainant seeks relief is, that there was a mutual mistake as to a material fact.

To a certain extent, the same objection taken to the insufficiency of the proof to sustain the allegation of fraud, will apply to the testimony which is relied upon to sustain the allegation

of a mistake. But for other reasons, I think that the complain-, ant has failed to make out a case which entitles him to relief on this ground.

To entitle a party to relief in a court of equity, on the ground of mistake, in a case free from fraud, the mistake must be, 1. As to a material fact constituting the very essence and condition of the contract. 2. The mistake must be as to a fact of such a nature, that the party could not by reasonable diligence get knowledge of it, when put upon inquiry. (1 *Story's Eq. Jurisp.* § 146.)

The fact in reference to which the complainant alleges that he was mistaken in this case, was a peculiar quality of the soil, which would enhance the value of the land in question, for a particular purpose, but which could have no influence upon its value for other or general purposes ; a quality too which, as appears by the testimony, belonged only to a very small strip of land upon that part of Long Island, and which would be affected in some measure by the nature of the season, and the method of cultivation adopted. It might admit of doubt, whether this is a fact of such a character that a court of equity could say, with certainty, that had there been full knowledge on the part of the complainant, he never would have entered into the contract. It appears by the testimony that the land in question was capable of producing early crops ; and it is, to say the least, questionable whether the complainant is entitled to relief because it did not fulfil his very sanguine expectations, in producing the earliest crops that could be produced in that part of Long Island.

The remaining question to be considered, is whether the fact in reference to which the complainant alleges that he was mistaken is not one of which he might have obtained knowledge, by reasonable diligence. If it is, it is a fact in reference to which a court of equity will suppose that he must have had knowledge, or, as is expressed in the rule of the civil law, which is cited with approbation by Justice Story ; knowledge will be imputed to him *qui eam rem diligenter inquirendo notam habere possit.* (*Story's Eq. Jurisp.* § 146, *note* 2. *Dig. lib.* 22, *tit* 6, 1, 9, § 2. *Pothier Pand. lib.* 22, *tit.* 6, § 4, *note* 11.) A

The People v. Davison.

court of equity refuses its aid to those who "by their own neg-
ligence, and by that alone, have incurred the loss or may suffer
the inconvenience." (*Ibid.*)

In this case, if the complainant had considered it so essential
to ascertain whether there was any land upon that part of Long
Island, capable of producing earlier fruits or vegatables, he
could easily have informed himself. But it seems that, instead
of using any means to do so, when he inquired of Mr. Beuren,
who owned land in the neighborhood, as to the value of the
land in question, he did not even make the inquiry as to its
quality for producing early crops.

With these views, I am of opinion that the decree made at
the special term should be reversed with costs.

McCoun, J. concurred.

Decree reversed.

---

Monroe Special Term, July, 1848.     *Welles*, Justice.